**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **ISABELLE K. et al.,** | **CIVIL ACTION** |
| Plaintiffs, | |
| *v.* | **NO. 5:19-cv-05517-KSM** |
| **MANHEIM TOWNSHIP SCHOOL DISTRICT,** | |
| Defendant. | |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                                 **January 26, 2022**

After conducting a special education due process hearing, an administrative hearing

officer determined that the Manheim Township School District (the "District"), provided Isabelle

K., the minor daughter of Christopher K. and Jennifer K. (collectively, the "Plaintiffs") for the

2017–2018 and 2018–2019 school years.  (*See* Doc. No. 22 at 9–39.)  The hearing officer denied

Plaintiffs' demands for compensatory education and tuition reimbursement.  (*Id.* at 39.)

As permitted under the Individuals with Disabilities Education Act ("IDEA"), Plaintiffs

filed a complaint challenging *only* the hearing officer's determination that the District provided

Isabelle a FAPE for the 2018–2019 school year and alleging violations of Section 504 of the

Rehabilitation Act of 1973 and the Americans with Disability Act ("ADA").  (Doc. No. 1.)  After

the Court granted Plaintiffs' Motion for Additional Evidence (Doc. No. 13), Plaintiffs filed a

Motion for Judgment on the Administrative Record, which is presently before the Court[1] (Doc.

---

[1] Initially, Plaintiffs only filed a Statement of Undisputed Facts in Support of Their Motion for Judgment on the Administrative Record (Doc. No. 23) and a Memorandum of Law in Support of Their Motion for Judgment on the Administrative Record (Doc. No. 28).  Subsequently, Plaintiffs filed their

No. 33).  Following oral argument and for the reasons below, Plaintiffs' motion is denied.

## I.

### A.   *Factual Background*

Isabelle is a twelve-year-old with autism,[2] a speech and language impairment, and Attention Deficit/Hyperactive Disorder who resides within the District.  (Doc. No. 22-1 at 119; Doc. No. 22-6 at 71, 125.)

### 1.   Early Education and the First Half of Second Grade in Delaware

In the summer of 2012, following Isabelle's difficulties adjusting to two preschool programs, she was referred for a psychological evaluation and found to be demonstrating behaviors frequently present in children with autism.  (Doc. No. 22 at 404–08.)  Isabelle enrolled at Schreiber Center for Pediatric Development for preschool, and pursuant to Pennsylvania's Early Intervention Process, an initial evaluation was conducted in the spring of 2013.  (*Id.* at 410.)  Isabelle was diagnosed with autism, and following a pre-enrollment individualized education program ("IEP") meeting on May 24, 2013, she started to receive early intervention services through Lancaster-Lebanon Intermediate Unit-13 (the "IU").[3,4]  (Doc No. 22-6 at 58.)

---

motion.  (Doc. No. 33.)

[2] Autism is "developmental disability significantly affecting verbal and nonverbal communication and social interaction."  34 C.F.R. § 300.8(c)(1)(i).  Characteristics associated with autism include "engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences."  *Id.*

[3] The IU is an educational agency that offers a wide variety of services, including autism support services.  (Doc. No. 22-6 at 58.)  Isabelle's early intervention services included speech, occupational therapy, and physical therapy.  (Doc. No. 22 at 435–36.)  She also received an itinerant teacher through the IU.  (*Id.*)

[4] Subsequently, Isabelle's parents participated in early intervention IEP meetings on April 7, 2014 (annual review); December 4, 2014 (other updates); and March 24, 2015 (annual review).  (Doc. No. 22-6 at 74.)

2

In October 2014, Isabelle enrolled in the Early Education Center at the Lititz Christian School two days a week and continued the other three days at Schreiber Pediatrics.  (*Id.* at 126.)

In May 2015, although she was not enrolled in public school, Isabelle's parents allowed the District to evaluate Isabelle as she transitioned from early intervention to school-age programming.  (Doc. No. 22 at 431.)  The District's IEP team issued the Reevaluation Report on September 17, 2015, and concluded that, as a student with autism, Isabelle would qualify for special education support were she to enroll in the District's public elementary school.  (*Id.* at 426.)  At the time, Isabelle was enrolled in kindergarten at the Lititz Christian School (*id.* at 409),[5] and in December 2015, halfway through kindergarten, Isabelle transferred to another private school, Montessori Academy of Lancaster ("Montessori"), where she attended pre-first grade for the remainder of the year (Doc. No. 22-6 at 123).[6]  Isabelle continued at Montessori for first grade.[7]  (Doc. No. 22 at 435.)

Prior to the 2017-2018 school year, Isabelle and her parents moved to Lewes, Delaware,[8] and Isabelle enrolled in second grade at R.A. Shields Elementary School in the Cape Henlopen

---

[5] Isabelle started kindergarten at age six, one year later than most of her peers. (Doc. No. 22 at 436.)

[6] In February 2016, Isabelle was referred to Providence Behavioral Health for a neuropsychological assessment about ongoing cognitive and psychological concerns.  (Doc. No. 22-6 at 122–26; Doc. No. 22-7 at 1–2.)  Isabelle's diagnosis as a person with autism was confirmed, and she was diagnosed with Attention-Deficit/Hyperactivity Disorder.  (Doc. No. 22-6 at 125.)  This report offered a number of recommendations, including that Isabelle receive academic support through an IEP and that Isabelle attend individual psychotherapy.  (Doc. No. 22-7 at 1.)

[7] The hearing officer erroneously stated that Isabelle attended first grade in the District (*see* Doc. No. 22 ¶ 6); however, she did not enroll in the District until halfway through second grade.  As noted above, Isabelle attended kindergarten at Lititz Christian School and Montessori, and she attended first grade at Montessori.  (Doc. No. 22 at 435.)

[8] Isabelle's father continued to live and work in Pennsylvania but spent the weekends in Delaware with Isabelle and her mother.  (Doc. No. 22 at 357, 467.)

3

School District.  (*Id.* at 434.)  Because she qualified for special education services as a student

with autism, Isabelle was referred for an evaluation by Dr. Felicia M. Kaas, a certified school

psychologist with the Cape Henlopen School District.  (*Id.* at 434–51.)  Dr. Kaas noted specific

cognitive and academic strengths and weaknesses and identified concerns related to Isabelle's

functional communication and internalizing behaviors, such as anxiety.  (*Id.* at 451.)  Isabelle

also received physical therapy, speech and language therapy, and occupational therapy

evaluations.  (*Id.* at 452–66.)  Following these evaluations, the Cape Henlopen School District

proposed that Isabelle receive instruction in compliance with the Delaware Autism Program

Guidelines at Love Creek Elementary School, another elementary school within the Cape

Henlopen School District that the Shields IEP team thought would "better serve [Isabelle's]

educational needs."[9]  (Doc. No. 22-1 at 58.)  Isabelle's parents toured Love Creek on November

6, 2016, but following their tour, Isabelle's parents and the Shields IEP team determined that

"Isabelle's needs would be best met at Shields in the resource room setting for language arts and

math instruction (need based) and in the regular classroom for science, social studies, and math

(grade level instruction), lunch, recess and related arts."  (*Id.* at 60.)  Dr. Kaas explained that

because the Shields IEP team identified Isabelle as a student "whose behavior impedes learning"

and who needs "[p]ositive behavior interventions, supports, and strategies," they would be

seeking permission for a functional behavior assessment for Isabelle.[10]  (*Id.* at 34, 54.)

Following these meetings, on November 6, 2017, Shields proposed an IEP (the

"Delaware IEP").  (*Id.* at 6–51.)  The Delaware IEP provided that "Isabelle's receptive and

---

[9] Shields did not have autism certified teachers.  (Doc. No. 22-1 at 54.)

[10] Shields never conducted a Functional Behavioral Assessment because, within weeks of Shields
implementing the IEP, Isabelle and her parents moved back to Pennsylvania.

4

pragmatic language deficit require[s] skills be supplemented with a multimodal approach including visuals to increase understanding, repetition of skills, prompting and error corrections strategies, scaffolding of skills, and that she [was to be] provided with direct speech and language therapy for small group instruction with large group application." (*Id.* at 33.) Under the Delaware IEP Isabelle's reading, writing, and math instruction was to be provided in the special education setting. (*Id.* at 55.) Isabelle was also to receive occupational therapy and speech therapy in the special education setting to work on her handwriting and listening comprehension goals. (*Id.* at 54.) She was to receive occupational therapy three times a month in a group setting for 30 minutes each session, with a once-a-month 15-minute consultation (for a total of 105 minutes per month). (*Id.*) Additionally, Isabelle was to receive speech and language services in a small group setting five times a month for 30 minutes per session (for a total of 150 minutes per month).[11] (*Id.*) The Delaware IEP also provided for the use of a classroom amplification system[12] for large group settings of science, social studies, art, music, computer, and library. (*Id.* at 33.)

In all, the Delaware IEP provided that Isabelle was "engaged in the regular education setting for 61% of her school week" for "science, social studies, lunch, recess and specials." (*Id.* at 50.) Isabelle was in the "special education setting for speech therapy, occupational therapy, reading, writing and math for 39% of her school day."[13] (*Id.*) On November 6, 2017, Isabelle's

---

[11] The small group speech and language services focused on teaching social concepts "to facilitate appropriate social interactions and positive relationships with both peers and adults; use of visual supports and scripts as needed to facilitate appropriate social skills." (Doc. No. 22-1 at 24, 37.)

[12] Classroom amplification systems enable teachers to stabilize acoustics in the classroom so that their voices are clear to all students, regardless of where they are seated in the classroom.

[13] Isabelle may have been spending even more than 39% of her school day in the special education setting. In the minutes from the November 6, 2017 IEP meeting, the Shields IEP team notes, "Isabelle will be receiving reading, writing, and math instruction in the special education setting for 39% of her school day. She will *also* receive occupational therapy and speech therapy in the special education

parents approved the Delaware IEP[14] and waived their right to wait for ten school days before implementation, so the Delaware IEP went into effect the following day.  (*Id.* at 60.)  Within weeks of the Delaware IEP's implementation, Isabelle's family decided to return to Pennsylvania.[15]  (Doc. No. 22 at 358.)

### 2.    The Second Half of Second Grade at Reidenbaugh Elementary

In December 2017, Isabelle enrolled in second grade at Reidenbaugh Elementary, an elementary school in the District.  (Doc. No. 22-1 at 64.)

### a.    The Interim IEP and Isabelle's Initial Progress

Upon Isabelle's enrollment, the District prepared an interim interstate transfer IEP based on the Delaware IEP (the "Interim IEP").[16]  (*Id.* at 63–84.)  The Interim IEP adopted the Delaware IEP's statement of Isabelle's level of educational and functional performances, six goals, and thirteen forms of specially designed instruction.  (*Id.*)  The Interim IEP was only materially different from the Delaware IEP in two respects:  it removed the classroom amplification system (Doc. No. 25 ¶ 30) and called for Isabelle to receive itinerant learning support services at the elementary school (Doc. No. 22-1 at 63–84).  Under the Interim IEP, Isabelle would spend more than 80% of her time in the regular education classroom.  (*Id.*)

---

setting."  (Doc. No. 22-1 at 55 (emphasis added).)

[14] The Delaware IEP included that Isabelle attend the Sussex Consortium's 12-month programming during the summer of 2018.  ( Doc. No. 22-1 at 58.)

[15] Isabelle also missed approximately two weeks of school in late November 2017, just weeks after the Delaware IEP was implemented, due to a surgery and a family vacation to Disney World.  (Doc. No. 22 at 357.)

[16] In January and February 2018, Isabelle's IEPs were prepared and reviewed by Isabelle's parents and the school's principal and Isabelle's special education teacher, regular education teacher, speech/language pathologist, and occupational therapist (together, the "IEP Team").  (*See* Doc. No. 22-1 at 117.)  Beginning in April 2018, Isabelle's IEP Team also included the school's psychologist and a special education consultant.  (Doc. No. 22-2 at 13.)

Upon receipt of the Interim IEP, Isabelle's parents requested an informal meeting with the other members of the IEP Team. (*Id.* at 81.) They informally met on January 2, 2018. (Doc. No. 22-1 at 89; Doc. No. 22-5 at 109.) Isabelle's parents expressed their concern "regarding the amount of time [Isabelle was spending] in special [education]" in Pennsylvania compared to Delaware, and the District explained the differences between the services they offered, and the services offered in Delaware.[17] (Doc. No. 22-1 at 96.) Additionally, Isabelle's parents discussed their concern regarding Isabelle's written expression, and the District agreed to add a specially designed instruction to collect baseline data to determine if there was a written expression need in addition to Isabelle's already-established handwriting issues. (*Id.*) The District also recommended a reevaluation to assess Isabelle's areas of strengths and needs. (*Id.* at 114.) The District planned to use the findings from the reevaluation to develop a new IEP better tailored to Isabelle's needs. (*Id.*) The IEP Team agreed to meet again in February for an annual IEP review. (Doc. No. 22-5 at 114.) Isabelle's parents approved the revised Interim IEP on January 10, 2018. (Doc. No. 22-1 at 115.)

On January 25, 2018, Isabelle's special education teacher reached out to her parents to schedule the annual IEP meeting. (Doc. No. 22-5 at 114.) Isabelle's mother responded, scheduling the meeting for February 8, 2018 and reporting that Isabelle was "coming home very stressed out daily" and was "very upset she doesn't understand the curriculum & tests in the [regular education] classroom." (*Id.*) On February 3, 2018, Isabelle's mother reiterated these

---

[17] The Delaware IEP also called for "push-in" instruction, but the District offered "pull-out" instruction, instead. (Doc. No. 22 at 220.) "'Pull out' services require taking a student from the [regular education] classroom setting and working with the student individually or in a small group. 'Push in' services do not require removing the student from the classroom; instead, the teacher or therapist comes into the classroom and works with the student and the student's teacher within the student's curriculum." *See Marple Newtown Sch. Dist. v. Rafael N.*, Civil Action No. 07–0558, 2007 WL 2458076, at *2 n.5 (E.D. Pa. Aug. 23, 2007).

concerns to her regular education teacher, explaining that Isabelle was overwhelmed at school and was feeling "stupid and dumb." (*Id.* at 120.)

### b.       The February 2018 Annual IEP Meeting

Prior to the February 2018 annual IEP meeting, Isabelle's parents and District personnel exchanged emails concerning the District's proposed reevaluation of Isabelle. (*Id.* at 117–31.) Isabelle's parents were hesitant to agree to the reevaluation since she had just been evaluated by Dr. Kaas in Delaware. (*Id.* at 117.) The District attempted to explain that, unlike Delaware, Pennsylvania did not utilize a "Record Review Consent Form," so the District was required to conduct "a record review, observ[e Isabelle], [obtain] input from the IEP team (parent, teacher, therapists, etc.), and [conduct a] FBA [Functional Behavior Assessment] if needed." (*Id.* at 125.) Isabelle's parents requested that the District include school personnel from Shields to make certain the District had all the information from Isabelle's recent evaluation in Delaware. (*Id.*) The District agreed. (*Id.*)

On February 15, 2018, the District held Isabelle's annual IEP meeting. (Doc. No. 22-1 at 119, 121.) The IEP team reviewed data from Isabelle's second marking period report card and discussed her recent struggles in the regular classroom. (*Id.* at 124–34.) Unfortunately, Isabelle was performing below the second-grade level in the areas of reading, spelling, math, and writing. (*Id.*) Isabelle's regular education teacher stated that she was "well behind her regular education peers" academically. (*Id.* at 130.) Her regular education teacher also noted that Isabelle struggled with calling out totally unrelated statements during instruction and needed "many" prompts on what behavior was classroom appropriate. (*Id.*) The IEP Team agreed that immediate revisions needed to be made to Isabelle's IEP to help address her academic and functional performance. (*Id.*)

The District proposed substantial revisions to address these issues (the "February 2018 IEP"). (*Id.* at 119–53.)  First, the February 2018 IEP increased Isabelle's direct math instruction from 30 minutes per day to 90 minutes per day, and her math goals were revised to target skills to close the gap between her current level and second-grade level.  (*Id.* at 125–26.)  Second, the IEP team added direct instruction in written expression for 30 minutes per day and included goals to target Isabelle's progress in the areas of written expression (planning and conventions). (*Id.* at 126–27.)  Third, Isabelle's language arts instruction was revised to account for her participation in second grade specials (art, music, and gym), so Isabelle's direct instruction in language arts was increased to 90 minutes per day, 3 days a week and 120 minutes per day, two days a week.  (*Id.* at 127–30.)  The language arts direct instruction continued to focus on reading comprehension, reading fluency, and reading encoding and decoding and added specific goals to target her progress in these areas.  (*Id.*)  Additionally, the IEP team decreased Isabelle's direct speech-language support instruction from 150 minutes per month to 120 minutes per month (*id.* at 130, 146), but the revised IEP added direct instruction in social skills (specifically, skills related to interaction with peers) for twenty minutes per day, three days a week (*id.*).  Last, the revised IEP added a goal in perspective taking so the IEP team could monitor Isabelle's progress in social skills instruction.  (*Id.*)

In sum, the IEP team found that "participation in the regular education classroom would not meet her individualized learning needs," so the revised IEP provided that all of Isabelle's instruction for reading, math, and writing would occur in a special education classroom.  (*Id.* at 150–51.)  Thus, the amount of time Isabelle spent in the regular education classroom dropped from 80% to 40%.  (*Id.* at 153.)  Isabelle's parents agreed with the IEP revisions and returned

their approval on February 19, 2018.[18]  (Doc. No. 22-2 at 5.)

At the February 15, 2018 meeting, Isabelle's parents inquired about a Positive Behavior Support Plan, and the District explained that it had to conduct a Functional Behavioral Assessment first to determine if Isabelle needed a Positive Behavior Support Plan.[19]  (Doc. No. 22-1 at 132.)  The February 2018 IEP called for Isabelle to receive a Functional Behavioral Assessment within 60 days of its implementation.  (*Id.* at 146.)

At this meeting, the District also proposed, for the second time, a reevaluation for Isabelle even though she had been evaluated just a few months earlier in Delaware.  (Doc. No. 22-2 at 100.)  The District explained that Pennsylvania regulations required some type of evaluation or reevaluation when a student with a disability moves into Pennsylvania from another state.  (*Id.*)  And, although the District had previously evaluated Isabelle when she was in preschool in 2015, Isabelle never enrolled in the District, so no IEP had been implemented at that time.  (*Id.*)  The District needed to reevaluate Isabelle to comply with Pennsylvania regulations. (*Id.*)  The District assured the parents there would not be a need to conduct additional testing, and clarified that the reevaluation would include "parent and teacher current input, review of all educational records, observations, functional behavior assessment, in the area of occupational therapy- a Visual Motor Integration assessment, informal assessment of gross motor skills,

---

[18] At the February 15, 2018 meeting, Isabelle's parents asked whether they could observe Isabelle during the school day and expressed their concern that Isabelle was eating lunch by herself.  (Doc. No. 22-1 at 132.)  The District explained the procedure for parental observation and assured Isabelle's parents that she was not eating lunch alone.  (*Id.*)

[19] A Positive Behavior Support Plan is a supplement to an IEP that focuses on a child's behavioral needs.  *See Jack J. ex rel. Jennifer S. v. Coatesville Area Sch. Dist.*, CIVIL ACTION NO. 17-cv-3793, 2018 WL 3397552, at *11 (E.D. Pa. July 12, 2018).  The IDEA calls for schools to conduct Functional Behavioral Assessments and issue Positive Behavior Support Plans "as appropriate" when a child "who is already being educated pursuant to an IEP continues to exhibit behavioral problems."  *Id.* (citing 20 U.S.C. 1415(k)(1)(D)).

functional vision, functional fine motor skills, and organization, speech and language input."  (*Id.* at 101.)  Following this discussion, Isabelle's parents consented to the reevaluation.  (*Id.* at 100.)

### c.    *Isabelle's Behavioral Decline, the April 2018 IEP, and the End of Second Grade*

The District started reevaluating Isabelle, including having the certified school psychologist conduct a Functional Behavioral Assessment.  (Doc. No. 22 at 221; Doc. No. 22-7 at 18.)  While completing this process, both the District and Isabelle's parents had growing concerns regarding Isabelle's interactions with peers.  (*See* Doc. No. 22 at 174 ("[W]e were seeing more behaviors than we had been . . . when she had first arrived . . . more of the noncompliance, off topic, more of the disruptive behaviors.").)  Isabelle's prior behaviors, including negative self-talk and off-topic comments, which had been addressed during the February 2018 IEP meeting, continued, and Isabelle also began engaging in self-injurious behavior and stating at times that she "want[ed] to die."  (*Id.*)  By April 2018, Isabelle's parents notified her teachers that she was having issues with one of her classmates.[20]  (*See* Doc. No. 22-5 at 132–33) (email from Isabelle's father reporting "some issues Isabelle is having with a classmate [that] [s]he has been talking . . . about . . . for months").)

On April 9, 2018, the District and Isabelle's parents reconvened to discuss the Functional Behavioral Assessment and reevaluation.  (Doc. No. 22-2 at 11.)  The Functional Behavioral Assessment revealed that Isabelle struggled with coping skills, self-regulation, identifying and expressing feelings, and social skills.  (*Id.* at 87 ("When Isabelle is in class . . . , she will speak negatively about herself especially when faced with challenge.  She also is frequently making

---

[20] Specifically, on April 3, 2018, Isabelle's father complained that during gym class this student allegedly smacked Isabelle on the rear with a tetherball.  (Doc. No. 22-5 at 132.)  Isabelle's regular education teacher shared the father's concerns with Isabelle's special education teacher and the guidance counselor and asked them to help Isabelle handle these situations.  (*Id.*)

off-topic comments not relevant to [the] situation at hand and that are spoken while teacher or peers are talking.  These behaviors occur daily and continuously . . . . Isabelle will occasionally hit [herself] on the hand with the other hand or mimic doing so.").  The reevaluation also confirmed that Isabelle had communication, social, emotional, and behavioral deficits.  (*Id.* at 79.)  In addition to these behavioral concerns, Isabelle continued to struggle academically, particularly in reading, writing, and math.  (*Id.* at 32–39.)  The reevaluation report suggested that Isabelle may benefit from academic instruction on her current instructional levels, reinforcement of appropriate expressions of emotion and problem-solving, individual attention from the teacher, positive peer pairings, small group instruction, and clear and consistent expectations. (*Id.* at 16.)

At this meeting, Isabelle's parents expressed concern "with the terminology that Isabelle uses when she is feeling frustrated or upset at the home and school setting."  (*Id.* at 28.)  The District ensured the parents that they would work with Isabelle on positive self-talk and self-regulation strategies.  (*Id.*)  Isabelle's parents also noted that she had displayed some of these behaviors when she was younger, and the District and her parents agreed that "there may be some external factors that are making Isabelle resort to some of these behaviors."[21]  (*Id.*)

The District proposed another revised IEP to address Isabelle's behavioral areas of concern (the "April 2018 IEP").  (*Id.* at 11–53.)  The April 2018 IEP updated Isabelle's present levels and adopted many of the goals and strategies identified in the February 2018 IEP.  (*Id.*) Isabelle had met academic goals related to reading decoding, so the April 2018 IEP revised those targets upward.  (*Id.* at 18–19.)  The April 2018 IEP added specially designed instructions to

---

[21] The IEP does not specifically say, but the "external factors" causing Isabelle's behavioral issues may have been related to Isabelle's parents' ongoing marital troubles.  *See infra* n.27.

address the academic goals she had not met in the areas of reading comprehension, reading fluency, reading encoding, and math computation.  (*Id.* at 18–21.)  It also added goals related to social skills and behavior, including self-regulation and following directions, and added specially designed instructions such as preferential seating near the source of instruction, thoughtful peer group pairings, a daily visual schedule, and role-playing instruction to inform the student how to act in social settings and control her frustrations.  (*Id.* at 42–47.)

The April 2018 IEP also discontinued occupational therapy.  (*Id.* at 27.)  Under the Delaware IEP (and, as a carry over, in the Interim IEP and February 2018 IEP), Isabelle had been in occupational therapy because she had been confusing capitalized and lower-cased letters.  (*Id.*)  Because Isabelle's issue with capitalization was a writing mechanics issue, not a fine-motor deficit, and because Isabelle's parents wanted her to spend more time on academic instruction, not occupational therapy, the IEP team agreed that occupational therapy was not necessary and discontinued this service.  (*Id.* at 27–28.)

The April 2018 IEP also included a Positive Behavior Support Plan, which identified areas for replacement instruction and strategies for combatting behaviors of concern, including "[n]egative self-talks, [o]ff topic comments, and [g]estures self-injurious behavior."  (*Id.* at 54–59.)  Isabelle's parents approved the April 2018 IEP, including the Positive Behavioral Support Plan, without objection or discussion.  (*Id.* at 66.)

As the 2017–2018 school year winded down, Isabelle met certain academic goals set forth in her IEP, but she continued to struggle socially.  (Doc. No. 22-2 at 8–10.)  Specifically, in early June, just days before the end of the school year, Isabelle's father went to the principal's office and reported that Isabelle had stated that "a student in her class had touched her rear."  (Doc. No. 22 at 114.)  The principal called in Isabelle's regular education teacher, who was

unaware of the incident and wished Isabelle had reported it at the time, but agreed to investigate it.  (*Id.*)  After this meeting, Isabelle's father emailed her regular education teacher saying that it was unreasonable that the teacher had expected Isabelle to report the incident immediately, "[e]specially in the #MeToo era in an educational setting."  (Doc. No. 22-5 at 137.) Nevertheless, he deferred to the regular education teacher as to "how best to deal with the situation."  (*Id.*)  The regular education teacher spoke with the students involved and learned that they had been playing tag and tagged each other on the rear.  (*Id.*)  The teacher informed Isabelle's father in an email that she decided not to discuss the incident further with Isabelle because "Isabelle arrive[d] at school [the next day] happy and in a good mood."  (*Id.*)  Isabelle's father responded, explaining that the incident was "textbook sexual harassment" and stating that the teacher's "'blame the victim' (for not immediately reporting) approach went out of style 20 years ago."  (*Id.*)

### 3. Third Grade at Reidenbaugh Elementary

#### a. *The Beginning of the Year and the August 2018 IEP*

Although Isabelle's father deferred to the regular education teacher's decision how to handle the playground incident at the end of the 2017–2018 school year, he was still upset about the incident at the end of the summer, right before the start of the 2018–2019 school year.  (*Id.* at 142.)  He requested an IEP meeting to "ensur[e] adequate and necessary accommodations are in place for the upcoming school year."  (*Id.*)  He explained, "Isabelle is completely dreading returning to school because of how she was treated by numerous classmates.  I do plan to address her peer interactions, appropriate behavior, and enforcement at our next meeting."  (*Id.*)  The District scheduled a meeting with Isabelle's parents on August 30, 2018.  (Doc. No. 22-2 at 104.)

During the meeting, Isabelle's parents reported that they were pleased with the start of

third grade as Isabelle appeared to be coming home happy each day.  (*Id.* at 110).  Isabelle's parents sought assurance that individuals who worked with Isabelle were made aware of the accommodations that are included in her IEP and expressed concern that Isabelle became overwhelmed during high-stimulus periods, such as at lunch or during dismissal.  (*Id.*).  Based on these concerns, the IEP Team agreed to make certain revisions to Isabelle's IEP:  (1) Isabelle would stand beside the teacher at dismissal to leave as soon as her parent arrived; (2) Isabelle would be paired with a positive peer at lunch to help make social interactions easier for her; (3) Isabelle would have planned check ins during the day to ensure she could consistently speak to an adult and share the highlights of her day and discuss any issues that may have occurred throughout the day, such as at lunch or during recess; and (4) Isabelle would be observed by a specialist from the IU in structured and unstructured settings to determine if she might benefit from itinerant autistic support.  (*Id.*)  The IEP Team added two specially designed instructions to address these modifications.  (Doc. No. 22-3 at 1.)

The IEP Team also reviewed Isabelle's progress data from the fourth marking period in the prior school year and updated four of the goals that she had successfully achieved.[22]  (*Id.* at 15.)  Isabelle's parents approved the August 2018 IEP without objection or comment.  (*Id.* at 18.)

### b.    *Isabelle's Progress and the October 2018 IEP*

During the fall of 2018, the District provided daily updates to Isabelle's parents using the communication logs[23] and notes from the guidance counselor's daily check-ins (which were first

---

[22] Isabelle met her reading comprehension, reading fluency, written expression (planning) and math computation goals.  (Doc. No. 22-3 at 15.)

[23] The communication logs were implemented in the April 2018 IEP and the accompanying Positive Behavior Support Plan.  On these communication logs Isabelle's teachers indicated Isabelle's behavior during each period throughout the day (e.g., during math, during recess) using a smiley face 😊 or a frowny face ☹️.  (*See, e.g.*, Doc. No. 22-8 at 8.)  There was also an area for notes about Isabelle's

called for in the August 2018 IEP).  (*See* Doc. No. 22-7 at 81–193; Doc. No. 22-8 at 1–26.)

Although Isabelle had some academic success throughout the fall, she continued to struggle

socially and behaviorally.  (Doc. No. 22 at 18–19 ¶¶ 34–45.)  She was anxious around certain

classmates, and her anxiety manifested in expressions of self-harm and self-injurious

behaviors.[24]  (Doc. No. 22 at 20 ¶ 43; Doc. No. 22-7 at 69.)

As called for in the August 2018 IEP, Aimee Davis Potter, an itinerant autistic support

teacher with IU, observed Isabelle on October 1 and 4, 2018.  (Doc. No. 22-5 at 4–13.)

Ms. Potter issued her report on October 18, 2018, finding that Isabelle "needs support with

responding to communication, understanding perspectives, emotional regulation and flexibility,"

"needs intermittent support in the areas of initiating communication and executive functioning,"

and would benefit from itinerant autistic support.  (*Id.*)  Ms. Potter recommended that Isabelle

receive 240 minutes of direct instruction in social thinking and emotional regulation per month

---

behavior on the logs.  (*Id.*)

[24] For instance, on September 18, 2018, Isabelle poked her eyes with a pencil and said she "d[idn't] deserve to live"; on September 24, she threatened to burn herself and to hurt herself with a knife; on October 17, she said, "I wish I wasn't even living anymore"; on October 18, she said, "I might as well die"; on October 24, she said, "I don't care about my life"; and on October 29, she said, "I'm going to suffocate myself with a trash bag."  (Doc. No. 22 at 18 ¶ 35.)

Although Isabelle made these statements and engaged in this behavior, the school did not conduct a risk assessment, as required by school policy.  (Doc. No. 22 at 141.)  The District's Special Education Supervisor testified that for students with "Special Ed and Behavior Plans that have [self-harm] identified as a behavior or concern, we adjust through the IEP first [sic] process first because we know that that's an identified behavior or concern.  And if it goes beyond the level of we're afraid that safety is a need or safety is a concern, then we go that route for Special Ed students."  (*Id.*)  Here, given the District's knowledge of Isabelle's hyperbolic tendencies, including specific input from Isabelle's parents, it did not believe a risk assessment was necessary.  (*See* Doc. No. 22 at 366 (testimony from Isabelle's father's deposition stating, "Isabelle will make exaggerated comments.  She'll say things like, you know, something tiny goes wrong in the morning, she'll say I guess my day is ruined then or you must just want me to die."); Doc. No. 22-8 at 3 (note from Isabelle's mother in the communication log saying, "For the record—Isabelle has never 'self-harmed.'  Upon her diagnosis, she would bite her arm or scratch when she was extremely frustrated or over-stimulated in a situation. . . . This is an autism issue with self-regulation.").)

and that Isabelle's teachers and staff members who work with Isabelle receive 60 minutes per month of instruction on strategies to best support Isabelle.  (*Id.* at 7.)

Based on this report, the District held a telephonic IEP meeting with Isabelle's parents on October 29, 2018 and proposed several revisions to the August 2018 IEP (the "October 2018 IEP").[25]  (Doc. No. 22-3 at 81–132.)  As Ms. Potter recommended, the October 2018 IEP provided for Isabelle to receive itinerant autistic support in the form of 240 minutes per month of direct instruction on "social thinking" and called for Isabelle's teachers to receive 60 minutes per month of autistic support training.  (*Id.* at 141.)  Isabelle's parents agreed to the revisions, and they went into effect on October 29, 2018.  (*Id.*)  Isabelle's teachers were optimistic the itinerant autistic support would help with Isabelle's behavioral issues.  (*See* Doc. No. 22-5 at 152.)

### c.   *Isabelle's Decline, the November 2018 IEP, and Her Eventual Withdrawal*

As the fall semester continued, Isabelle's behavior unfortunately continued to decline. She fixated on one particular student in her special education class and felt that he constantly invaded her space.[26, 27]  (Doc No. 25 ¶¶ 116–18.)  Isabelle's parents reported that Isabelle

---

[25] Earlier in October 2018, a physical therapist had observed Isabelle and recommended that Isabelle receive physical therapy "to address her decreased coordination and ball skills."  (Doc. No. 22-3 at 38.)  The IEP Team held a telephonic meeting and revised Isabelle's IEP to include the physical therapy on October 15, 2018.  (*Id.* at 24.)

[26] Multiple entries from Ms. Potter's observations and the communication log illustrate Isabelle's fixation on this student.  (*See, e.g.*, Doc. No. 22-5 at 10 (noting that Isabelle was seated next to a friend in a reading circle and that, when the friend left the circle, Isabelle said, "Eww, I don't want to be next to [the student upon whom she was fixated]" and that, when the friend returned, she said, "Thank goodness you['re] back."); Doc. No. 22-7 at 193 (communication log reporting that Isabelle "continued to talk in an agitated manner about [that student]" even though "he wasn't even in [the classroom]" and reporting that Isabelle stated that she "can't continue if he's going to be in this room"); Doc. No. 22-8 at 16 ("[A]fter speaking repeatedly inappropriately to a specific student, Isabelle was moved to another workstation. . . . After many prompts she continued to speak inappropriately about a student who wasn't even in the room."); *id.* at 24 ("Isabelle . . . talked nonstop about peer and talking about how she hates him."); *id.* ("[S]he blamed a peer for falling [out of her chair], but he was across the table.").

[27] This student was not the only source of stress for Isabelle; her parents were going through

claimed this student touched her on multiple occasions.  (*Id.* ¶ 117; Doc. No. 22 at 366.)  For

instance, at one point in the fall semester, this student, who had been friends with Isabelle,

thought she was upset with him.  (Doc. No. 22 at 119.)  He wanted to apologize, so he gave

Isabelle a hug and said he was sorry.  (*Id.*)  None of the District personnel thought that the hug

was malicious or that the student intended to agitate Isabelle, but Isabelle does not like being

touched, so this really upset her.  (Doc. No. 22 at 119, 292–93, 295.)  Although the District did

not believe that this student was intentionally egging Isabelle on,[28] Isabelle still exhibited anxiety

about this student, so it created separate zones on the playground:  Isabelle was to stay in her

zone, and the other student was to stay in his.  (*Id.* at 119–20.)

On November 6, 2018, Isabelle's mother emailed the District, requesting an IEP meeting

"to implement new strategies that [her parents] are already familiar with that are not only

focused on her behavior during and after a meltdown [but also on] prevent[ing] them from

---

marital troubles, and she often expressed anxiety about her parents' relationship during the school day.
(*See, e.g.*, Doc. No. 22 at 111 ("Isabelle was very anxious and worried about moving back to Delaware,
worried about her parents getting a divorce . . . ."); *id.* at 111–12 ("[W]e felt that Isabelle knew too many
adult-like things that were going on between [her parents], and that she was anxious about those things.");
*id.* at 226 ("She would talk about home situations a lot . . . in the classroom, and the teacher would kind of
prompt her that, well, that would be something to talk [about] . . . privately."); Doc. No. 22-4 at 137
(school nurse report stating that Isabelle was crying because "student's parents going through divorce.
Student stating she doesn't like mom . . . ."); Doc. No. 22-5 at 29 (phone log indicating that Isabelle was
upset about "mom stealing $ and watches"); Doc. No. 22-7 at 96 (communication log stating, "Isabelle
told me she was considering running away due to an argument in the house last night."); *id.* at 113
(communication log stating, "Isabelle told me right away after school that Dad told her . . . that Mom
stole his money & watches.").)

She also expressed concern that her parents would be unhappy if they found out she had been
behaving badly at school.  (*See, e.g.*, Doc. No. 22-7 at 32 ("Mom and Dad will be so mad at me for
getting frowns.  They'll probably kill me, murder me on the floor."); *id.* at 117 ("She is nervous to show
her parents her [communication logs].  She is afraid of the consequences and [illegible] some <u>very
extreme</u> actions she thinks they may take."); *id.* at 167 ("My parents are going to beat me for clipping
down [i.e., behaving badly at school].").)

[28] Isabelle also reported that this student told her he "wanted to lick her butt."  (Doc. No. 22 at
295.)

happening." (Doc. No. 22-5 at 162.)  Isabelle's mother explained that Isabelle was anxious about the frowny faces indicated in the communication logs and requested that Isabelle's special education teacher email the communication log directly to her parents rather than having Isabelle bring the log home.  (Doc. No.  22 at 342; Doc. No. 22-7 at 58.)  Isabelle's mother also informed the District that she had scheduled a private evaluation with Providence Behavioral Health, a group "with extensive experience in autism," to take place on January 24, 2019 and said that they may need another IEP meeting after the evaluation.  (Doc. No. 22-5 at 162.)  The District scheduled an IEP meeting for November 28, 2018 (Doc. No. 22-3 at 144) and agreed to send the communication logs directly to Isabelle's parents (Doc. No. 22 at 342; Doc. No. 22-5 at 161). On November 27, 2018, the day before the IEP meeting, the District's special education supervisor observed, "In reviewing the current data from this school year, some additional supports and/or interventions will be needed; the data on some of Isabelle's goals [both academic and behavioral] is trending down."  (Doc. No. 22-7 at 41.)  She also observed that incidents of Isabelle engaging in self-injurious behavior "have been happening more frequently . . . and need to be looked into further" and stated, "We need to get additional supports in place ASAP."  (*Id.*)

On November 28, 2018, the District met with Isabelle's parents to discuss how to revise her IEP to address her continued behavioral decline.  (Doc. No. 22-3 at 144.)  The District and Isabelle's parents were concerned that her social anxiety was not improving, and she remained fixated on a particular classmate in her special education classroom.  (*Id.*)  Isabelle's mother reported that Isabelle "hated" going to school and felt as though she had been bullied, mocked, and harassed.  (Doc. No. 25 ¶ 128.)

The District proposed a revised IEP (the "November 2018 IEP"), which included a six-step plan to address these issues:  (1) Isabelle will be observed at various points throughout the

school day by newer members of the IEP Team, including the District's Behavior Interventionist and Special Education Consultant, to gather additional information regarding the heightened behavioral issues; (2) behavior charts, communication logs, and information coming from the itinerant autistic support teacher will be sent to Isabelle's parents electronically; (3) the IEP Team will collect new academic baseline data to check that her goals reflect her current academic levels and to ensure that she is receiving the amount of direct instruction that she needs; (4) after Isabelle's parents receive the results from the private evaluation to be conducted by Providence Behavioral Health, the IEP team will reconvene to review the evaluator's report and update her IEP to reflect interventions recommended in the report; (5) after the academic baseline data has been updated and the IEP has been revised to reflect the findings from the private evaluation, the IEP Team will add the necessary accommodations and interventions to ensure that Isabelle has the tools she needs to reach the goals; and (6) Isabelle's behavior chart will be updated to prevent any outbursts that might be caused by the layout of the current behavior chart.  (Doc. No. 22-4 at 4–5.)  The District added a specially designed instruction for the additional observations and planned to meet again in January to further tailor Isabelle's IEP with the benefit of the District's observations and data-collection as well as the parents' private evaluation.  (*Id.*)

Despite the District's attempts to help Isabelle, she continued expressing anxiety about the other student in her special education room.  (Doc. No. 22-7 at 69–70.)  A few days after the IEP meeting, Isabelle's father emailed the principal and Isabelle's special education teacher stating that Isabelle claims that the same student continues to harass her for hugs and that another student told her she had bad breath.  (*Id.*)  He demanded that she and this student be placed in separate classes and that "an adult body be put on her at recess" in order to "provide her an

emotionally safe learning environment." (*Id.*)  The District's principal immediately responded with a plan to address his demands:  the District would place a divider in the special education room so that Isabelle could not see this student, and  the District would ensure that a staff member was always with Isabelle, including during transitions, lunch, and recess.  (Doc. No. 22-7 at 69.)  Isabelle's father responded, expressing optimism that this would "make Isabelle feel better, or at least less anxious." (*Id.* at 72.)  Although the District implemented these measures, Isabelle's anxiety, negative self-talk and self-injurious behaviors continued.  (Doc. No. 25. ¶¶ 119–20.)

Just a few days later, on December 10, 2018, the school guidance counselor notified Isabelle's parents that she was having a difficult day.  The counselor explained that Isabelle had been upset no one wanted to work with her and when the teacher had explained it was because the class was doing individualized learning, Isabelle had responded that she "might as well die then." (Doc. No. 22-8 at 51–52.)  After receiving this call, Isabelle's father picked up Isabelle from school.  The following day Isabelle's parents withdrew her from the District.  (Doc. No. 22-5 at 176–78.)

### 4.    **Montessori**

Following her withdrawal from public school, Isabelle's parents enrolled her in the local Montessori school.[29]  (Doc. No. 22 at 22 ¶ 89.)  At Montessori, Isabelle studies a variety of subjects, including reading, phonics, math, science, geography, and handwriting.  (Doc. No. 22-8 at 53–54.)  All of her instruction at Montessori takes place in the regular education classroom[30]

---

[29] Isabelle's father was actually at Montessori to meet with the head of school regarding Isabelle's possible enrollment when he received the District's counselor's call on December 10.  (Doc. No. 22 at 349.)

[30] Some of the lessons at Montessori are taught by Isabelle's peers rather than the teacher.  (Doc.

because Montessori does not have a special education classroom.  (Doc. No. 22 at 24 ¶ 101.)

Isabelle's teacher does not have any specific special education training; however, she has

received specialized training in educating students with autism.  (*Id.* at 23–24 ¶¶ 89–90, 101.)

Montessori does not provide the services Isabelle's evaluations have shown she needs in

connection with her pragmatic language deficits, such as speech language therapy and physical

therapy.  (*Id.* at 25 ¶ 102.)  Since enrolling at Montessori, Isabelle has significantly improved her

communication with teachers and classmates and except for two instances, has largely stopped

engaging in self-injurious behaviors.[31]  (Doc. No. 22 at 276–77.)  Her reading level has also

improved from first-grade-level comprehension to fourth-grade-level comprehension.  (Doc. No.

22 at 23 ¶ 91.)

### 5.      Isabelle's Post-Withdrawal Progress

On four separate occasions from January 2019 through March 2019 at the direction of her

parents, Isabelle was evaluated by a private school psychologist.[32,33,34]  (Doc. No. 22-5 at 179–

90; Doc. No. 22-6 at 1–42.)  The evaluator administered fifteen assessments to gauge Isabelle's

---

No. 22 at 25 ¶ 102.)

[31] Isabelle's Montessori teacher testified that Isabelle still gets agitated but is comforted when the Montessori teacher holds Isabelle's hands in a firm grip for approximately five minutes which restrains Isabelle from using her hands to injure herself.  (Doc. No. 22 at 277.)

[32] Interestingly, it does not appear from the record that Isabelle's parents kept the appointment they scheduled for January 24, 2019, with Providence Behavioral Health, the group "with extensive experience in autism," that had previously worked with Isabelle.

[33] The District did not object to the psychologist's qualifications in the areas of school psychology, neuropsychology, and counseling.  (Doc. No. 22 at 290.)

[34] Isabelle's parents also brought her back to the psychologist in May 2019 for a fifth visit to focus on the issues Isabelle had with the special education classmate in the Fall of 2018.  (Doc. No. 22 at 290; Doc. No. 22-6 at 31.)  The psychologist concluded that Isabelle suffered from Post-Traumatic Stress from her interactions with that student.  (*Id.* at 34.)

ability, achievement, behavioral, emotional, and/or social skills.  (*Id.*)  The evaluator also spoke with Isabelle's father and her teacher at Montessori, but he did not speak with Isabelle's mother or any teachers or staff from the District.  (Doc. No. 22 at 27 ¶¶ 114–15.)

The evaluator's findings are as follows:  Isabelle has an intelligence quotient of 66, which is in the impaired low average range (*id.* at 25–26 ¶ 107); she has significant weaknesses with processing speed, sequencing, mental flexibility, and organization (*id.*); she is in the tenth percentile in ability to function in social situations and the sixth percentile in ability to understand the mental state of another (*id.* at 26 ¶ 108); she has difficulty using verbal and nonverbal communication for social contact (*id.* ¶ 110); she does not react favorably to physical contact (*id.* ¶ 111); and she exhibits significant levels of depression and anxiety (*id.* at 27 ¶ 112).

### B.      *Procedural History*

Plaintiffs filed a due process complaint against the District on December 12, 2018, seeking compensatory education and tuition reimbursement for Isabelle's private education. (Doc. No. 22-8, Ex. 14.)  The hearing officer heard hours of argument and testimony from both parties and reviewed hundreds of pages of record evidence, and, on August 23, 2019, he found that the District had provided Isabelle with a FAPE and denied Plaintiffs' claims for compensatory education and tuition reimbursement.  (*See* Doc. No. 22 at 38–39.)  On November 21, 2019, Plaintiffs filed the complaint appealing the hearing officer's decision with regard to the 2018–2019 school year.  (Doc. No. 1.)  Plaintiffs seek tuition reimbursement beginning in January 2019, compensatory education from October 18, 2019 through December 10, 2019, and expert costs and attorneys' fees pursuant to Section 504 and the ADA.  (*Id.* at 27–28.)

On August 19, 2020, Plaintiffs filed the Motion for Judgment on the Administrative Record, arguing that the District denied Isabelle a FAPE, that Montessori was an appropriate

parental placement, and that the equities support tuition reimbursement.  (Doc. No. 28.)

Plaintiffs also argue that Isabelle was discriminated against on the basis of her disability.  (*Id.*)

The District opposes the motion, arguing that the hearing officer correctly determined that

Isabelle received a FAPE and that, even, if she had not, Montessori was not an appropriate

placement, and the equities weigh against tuition reimbursement.  (Doc. No. 29.)  The District

also argues that the Section 504 and ADA claims fail because Plaintiffs failed to exhaust their

administrative remedies and failed to prove that Isabelle was discriminated against.[35]  (*Id.*)   The

Court heard argument on the motion on January 25, 2022.  (Doc. No. 34.)

## II.

Plaintiffs seek review of the hearing officer's decision and claim that the District's failure

to provide Isabelle with a FAPE during the 2018–2019 school year discriminated against her in

violation of Section 504 and the ADA.  The Court considers both claims in turn.

### A.      *Review of the Hearing Officer's Decision*

Plaintiffs have asked the Court to reverse only the hearing officer's determination that the

District provided Isabelle with a FAPE during the 2018–2019 school year and grant their request

for tuition reimbursement and compensatory education.  (Doc. No. 1 at 27–29.)

#### 1.      Legal Standard

##### a.      *Statutory Framework*

The IDEA offers federal funds to states to assist in educating children with special needs.

*Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017).  In

---

[35] Plaintiffs also filed a 25-page reply brief in support of their motion.  (*See* Doc. No. 30.)  The Court's policies and procedures require parties to limit replies to ten pages, and Plaintiffs did not seek leave of the court to file a reply brief 15 pages in excess of the page limit, but the Court has nevertheless considered Plaintiffs' reply brief.

exchange, the state agrees to provide a FAPE to all eligible children. *Id.* A FAPE includes "special education" and "related services." *Id.*; *see also* 20 U.S.C. § 1401(9). "Special education" is "specially designed instruction . . . to meet the unique needs of a child with a disability," and "related services" are the services "required to assist a child . . . to benefit from" their special education. 20 U.S.C. § 1412(a)(1).

The IEP is "the centerpiece of the [IDEA's] education delivery system for disabled children." *Honig v. Doe*, 484 U.S. 305, 311 (1988). An IEP is a comprehensive plan prepared by the child's parents, teachers, and school officials detailing how the school will provide the child with the special education and related services that he or she needs. *Endrew F.*, 137 S. Ct. at 994 (citing 20 U.S.C. § 1414(d)). An IEP must propose an "educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.*

The IDEA sets forth detailed procedures for the preparation of IEPs:

> The IDEA requires that every IEP include "a statement of the child's present levels of academic achievement and functional performance," describe "how the child's disability affects the child's involvement and progress in the general education curriculum," and set out "measurable annual goals, including academic and functional goals," along with a "description of how the child's progress toward meeting" those goals will be gauged. §§ 1414(d)(1)(A)(i)(I)-(III). The IEP must also describe the "special education and related services . . . that will be provided" so that the child may "advance appropriately toward attaining the annual goals" and when possible, "be involved in and make progress in the general educational curriculum." § 1414(d)(1)(A)(i)(IV).

*Id.*

If a child's parents believe the education their child is receiving from his or her public school violates the IDEA, they may request an impartial due process hearing. 20 U.S.C. § 1415(f)(1)(A). The IDEA's administrative process is conducted in compliance with state

regulations. *Id.*  In Pennsylvania, hearings are conducted by "hearing officers," outside

contractors hired by the Pennsylvania Secretary of Education.  *See* 22 Pa. Code § 14.162(p)(1).

After exhausting their administrative remedies, parents dissatisfied with the hearing officer's

decision may seek judicial review in federal or state court.  20 U.S.C. § 1415(i)(2)(A); *see also*

*Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 272 (3d Cir. 2014).  On appeal, the

burden of proof falls on the party challenging the hearing officer's decision.  *See Schaffer v.*

*Weast*, 546 U.S. 49, 56–58 (2005).

### b.    Standard of Review

In IDEA cases, district courts are to conduct a "modified *de novo* review" of a hearing

officer's decision.  *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 269–70 (3d Cir.

2003).  The court exercises plenary review over the hearing officer's legal conclusions, *Colonial*

*Sch. Dist. v. G.K. ex rel. A.K.*, CIVIL ACTION NO. 17-3377, 2018 WL 2010915, at *2 (E.D. Pa.

Apr. 30, 2018), *aff'd*, 764 F. App'x 192 (3d Cir. 2019), but must give "due weight" to the

hearing officer's factual findings, *S.H.*, 336 F.3d at 269.  Although the hearing officer's factual

findings are considered *prima facie* correct, the court may depart from those findings if it

explains why and supports its explanation with citations to the administrative record.  *Id.* at 270.

The court may not, however, "substitute its own notions of sound educational policy for those of

local school authorities."  *Id.* (quoting *MM v. Sch. Dist. of Greenville Cty.*, 303 F. 3d 523, 530–

31 (4th Cir. 2002)).

### 2.    Analysis

Plaintiffs argue that the Court should reverse the hearing officer's decision for two

reasons:  (1) the hearing officer failed to apply the correct legal standard in assessing the IEP

(Doc. No. 28 at 10); and (2) the hearing officer erroneously concluded that the IEPs offered

Isabelle a FAPE even though they did not respond to her ongoing behavioral issues (*id.* at 14). The Court considers both arguments in turn.

### a.      The Hearing Officer Applied the Appropriate Legal Standard

Plaintiffs argue that the hearing officer applied the wrong legal standard because he assessed the sufficiency of the IEPs at the time they were offered rather than considering "whether Isabelle actually received what was promised either by the IEP itself or the IDEA." (*Id.* at 10.)  Plaintiffs also contend that the hearing officer erred because he declined to consider evidence of Isabelle's performance at Montessori.  (*Id.* at 10–11.)  In response, the District argues that the hearing officer applied the correct standard.  (Doc. No. 29 at 7–8.)  We agree with the District.

An IEP must be "reasonably calculated to enable a child to make progress in light of the child's circumstances."  *Endrew F.*, 137 S. Ct. at 999.  Although an IEP must be "reasonable," it does not have to be perfect.  *S.C. ex rel. Helen C. v. Oxford Area Sch. Dist.*, 751 F. App'x 220, 223 (3d Cir. 2018).  "A program need not and cannot guarantee a student's academic progress," *id.* (citing *Endrew F.*, 137 S. Ct. at 1001), so an IEP is not deficient simply because the child's progress is slow, *see K.D. ex rel. Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 255 (3d Cir. 2018).

"[T]he intent of the [IDEA] was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside."  *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 192 (1982).  Thus, hearing officers and district courts must assess whether an IEP provides a FAPE "as of the time it is offered to the student, and not at some later date." *Fuhrmann v. E. Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3d Cir. 1993).  "[S]o long as the IEP responds to the [child's] needs, its ultimate success or failure cannot retroactively render it

inappropriate."  *Carlisle Area Sch. v. Scott P. ex rel. Bess P.*, 62 F.3d 520, 534 (3d Cir. 1995).

Courts "may not rely on hindsight to second-guess an educational program that was reasonable at

the time."  *K.D.*, 904 F.3d at 254–55; *see also Esposito v. Ridgefield Park Bd. of Educ.*, 856 F.

App'x 367, 370 (3d Cir. 2021) ("And while school districts may have an advantage in IDEA

litigation because of their first-hand knowledge, the student's independent experts benefit from

second-guessing educational choices with clearer hindsight.  That is why the IEP's

reasonableness is measured at implementation.").

     Plaintiffs argue that the hearing officer erred in failing to consider "whether the child

actually received what was promised either by the IEP itself or the IDEA."  (Doc. No. 28 at 10.)

They contend that the hearing officer should have considered hindsight evidence in the form of

Isabelle's lack of behavioral improvement at the District and her eventual success at Montessori.

(*Id.* at 10–11.)  But the Third Circuit has admonished time and again that IEPs are to be assessed

"as of the time they are offered to the student, *not from some later date*."  *Fuhrmann*, 993 F.2d at

1040 (emphasis added); *see also Esposito*, 856 F. App'x at 370; *K.D.*, 904 F.3d at 254–55;

*Carlisle Area Sch.*, 62 F.3d at 534.

     Plaintiffs also contend that their position "is supported by the Supreme Court's

decision[s] in *Fry* and *Endrew F.*" (Doc. No. 28 at 11); however, neither of those decisions

supports Plaintiffs' position.

     First, Plaintiffs argue that the Supreme Court's decision in *Fry v. Napoleon Community

Schools*, supports their position because it provides that an IEP "must analyze whether

previously provided services were effective."  (Doc. No. 28 at 11 (citing *Fry v. Napoleon Cmty.

Schs.*, 137 S. Ct. 743, 754 (2017).)  Although this is an accurate statement of the law, *see* 20

U.S.C. §§ 1414(d)(1)(A)(i), it does not support Plaintiffs' argument that the hearing officer

should have considered evidence of Isabelle's progress in his analysis.  School districts are required to analyze whether the services provided in past IEPs were effective as part of their determination of whether the updated IEP is "reasonably calculated" to help the child make academic progress.  *Id.*  If, on this analysis, a school district found that certain services in earlier IEPs had done nothing to further the child's progress, it would not be reasonable to continue offering those services in an updated IEP, but the child's failure to progress would not render the earlier IEPs ineffective.  *See S.H.*, 336 F.3d at 265 (explaining that an "IEP team is required to review the IEP at least annually to determine whether the child is reaching the stated goals [and] to revise the IEP to address lack of progress"); *T.M. ex rel. T.M. v. Quakertown Cmty. Sch. Dist.*, 251 F. Supp. 3d 792, 808 (E.D. Pa. 2017) (illustrating that IEPs are updated based on the child's progress from earlier IEPs).

Next, Plaintiffs contend that, in *Endrew F.*, the Supreme Court "explained that the provision of a FAPE requires 'meaningful advancement toward challenging goals.'"[36]  (Doc. No. 28 at 11 (citing *Endrew F.*, 137 S. Ct. at 998).)  But the Supreme Court did not say this in *Endrew F.*  In *Endrew F.*, the Court explained that whether a district provided a FAPE turns on whether the child received an IEP that "enable[d] the child to make progress," not whether the child actually made progress.  *Endrew F.*, 197 S. Ct. at 999; *see also id.* at 1000 (explaining that the FAPE analysis hinges on the goals contained in the child's IEP).  The Third Circuit has endorsed this reading of *Endrew F.*, confirming that the relevant inquiry is whether the district provided the child with an IEP "reasonably calculated to enable the child to make progress."  *See S.C.*, 751 F. App'x at 223 ("[The School District] provided programs that were tailored to [the

---

[36] The phrase "meaningful advancement toward challenging goals" does not appear in the Supreme Court's opinion on *Endrew F.*  The Court does not know the source of this language quoted in Plaintiffs' brief.

child's] needs and abilities that were reasonably calculated to help him make academic progress. It is unfortunate that [the child] did not progress as far or as fast as his mother hoped he would. But [the School District] met its legal obligation."); *Colonial Sch. Dist.*, 763 F. App'x 192, 196–97 (confirming that hearing officers and courts cannot rely "on post-IEP performance to evaluate the IEP"); *K.D.*, 904 F.3d at 254 ("[The School District] complied with the IDEA.  It gave [the child] a free appropriate public education *by developing tailored IEPs*." (emphasis added)).

It is well-established that courts and hearing officers are not to consider hindsight evidence in assessing IEPs, so the Court rejects Plaintiffs' argument that the hearing officer erred in failing to consider evidence of Isabelle's later progress.

### b.      The IEPs Offered a FAPE

Plaintiffs argue that the District failed to provide Isabelle with a FAPE because the August 2018, October 2018, and November 2018 IEPs were not reasonably calculated to allow Isabelle to progress.  (Doc. No. 28. at 9–16.)  The Court must determine whether each IEP was "reasonably calculated to enable [Isabelle] to make progress in light of [her] circumstances" as of the time each IEP was offered.  *See Endrew F.*, 137 S. Ct. at 999; *Fuhrmann*, 993 F.2d at 1040.

Plaintiffs do not dispute that Isabelle made meaningful academic progress throughout second and third grade.  (Doc. No. 28 at 8.)  Instead, they argue that the IEPs failed to offer her a FAPE during the 2017–2018 school year because they did not address her "areas of primary educational need, including her social-emotional and communication deficits."  (*Id.*)  If a child's behavioral issues are hindering his or her ability to learn, a district's "systematic and consistent" failure to address those behavioral concerns in an IEP may constitute denial of a FAPE.  *Lauren P. ex rel. David & Annmarie P. v. Wissahickon Sch. Dist.*, 310 F. App'x 552, 554–55 (3d Cir. 2009); *see also R.B. v. Downingtown Area Sch. Dist.*, 509 F. Supp. 3d 339, 347 (E.D. Pa. 2020)

("Where a student's behavioral problems are impeding their ability to learn, and the school district fails to address those problems in an appropriate way, such a failure may constitute a denial of FAPE.").

The court considers whether each IEP offered a FAPE below.

(i)     The August 2018 IEP Offered a FAPE

The District revised Isabelle's IEP in August 2018, just two months after her April 2018 IEP implemented the recommendations from the District's reevaluation, because her parents reported she was "dreading returning to school."[37]  (Doc. No. 22-7 at 25.)  The hearing officer concluded that "[t]he August 2018 IEP updates reflected a data-driven choice to address the Student's needs and individual circumstances."  (Doc. No. 22 at 35.)  Plaintiffs disagree.  (Doc. No. 28 at 14.)  They contend that the August 2018 IEP was insufficient because it added no new academic or behavioral goals and that "after 5 months of implementation in 2nd Grade, the [preexisting] behavioral interventions produced no tangible progress in the areas in which she needed to derive benefit the most."  (Id. at 14–15.)

Plaintiffs' arguments are not supported by evidence.  In preparing the August 2018 IEP, the District reviewed Isabelle's progress monitoring data from second grade, which showed that she had met academic goals related to reading comprehension, reading fluency, written expression, and math computation.  (Doc. No. 22-2 at 103–41; Doc. No. 22-3 at 1–7.)  Given Isabelle's progress, the District revised those academic goals.  (Doc. No. 22-2 at 132–34.)

Although the District did not revise Isabelle's behavioral goals, it had just updated those

---

[37] Isabelle's father reported that she was "dreading returning to school" because of an incident that had happened on the playground at the end of second grade.  (Doc. No. 22-5 at 142.)  The District was surprised that Isabelle and her father were still upset about that incident because Isabelle's second-grade teacher believed that it had been resolved.  (Id. at 137.)

goals in the April 2018 IEP and Positive Behavioral Support Plan (which were implemented following a reevaluation and a Functional Behavioral Assessment).  (*Id.* at 11–53.)  These had only been in place for five school weeks and were intended to remain in place for at least a full school year.[38]  (*Id.* at 11, 139.)  It was reasonable for the District not to revise these goals before giving them a meaningful chance to take effect.  *See Ridley Sch. Dist. v. M.R.*, Civil Action No. 09–2503, 2011 WL 499966, at *14 (E.D. Pa. Feb. 14, 2011) ("Therefore, even if Parents are correct and the progress was merely 'illusory,' *the lack of progress in the brief period of time services were implemented does not render the IEP deficient*." (emphasis added)); *cf. R.B. v. Downingtown*, 509 F. Supp. 3d 339 (E.D. Pa. 2020) (affirming the hearing officer's decision that the student was denied a FAPE where the district did not meaningfully change the child's behavioral plan even though the child's behavioral issues continued for nearly two years).

Moreover, Isabelle's parents had reported that they were generally pleased with the start of school and Isabelle's behavior because she had been coming home happy.  (Doc. No. 22-2 at 110.)  They only requested the IEP meeting because Isabelle was getting overwhelmed in high-stimulus settings, such as at recess and during lunch.  (*Id.*)  And the District modified Isabelle's specially designed instruction to minimize her stress:  (1) Isabelle would stand beside the teacher at dismissal to leave as soon as her parent arrived; (2) Isabelle would be paired with a positive peer at lunch to help make social interactions easier for her; and (3) Isabelle would have two planned check-ins during the day to ensure she could consistently speak to an adult and share the

---

[38] Plaintiffs' contention that Isabelle's revised IEP had been in place for five months at the time of the August 2018 IEP meeting is disingenuous.  The April 2018 IEP and Positive Behavior Support Plan (which were implemented after a reevaluation and Functional Behavioral Assessment) went into effect approximately five *weeks* before the end of the 2017–2018 school year (Doc. No. 22-2 at 63), and the August 2018 IEP meeting was held in the first week of the 2018–2019 school year (Doc. No. 22-5 at 141).

highlights of her day and discuss any issues that may have occurred during high-stimulus parts of the day, for instance, at lunch or during recess.  (*Id.*)  The District also revised Isabelle's IEP to provide that she would be observed by a specialist from the IU in structured and unstructured settings to determine if she might benefit from itinerant autistic support.  (*Id.*)

The Court will not disrupt the hearing officer's decision that the August 2018 IEP offered a FAPE, particularly in light of the fact that it made multiple revisions directly targeted at limiting the amount of time Isabelle was in high-sensory, overwhelming situations.  "The district's strategy for dealing with [Isabelle's] problematic behavior 'is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers.'"  *T.M. v. Quakertown Cmty. Sch. Dist.*, 251 F. Supp. 3d 792, 807 (E.D. Pa. 2019) (quoting *T.L. v. Lower Merion Sch. Dist.*, Civ. No. 15-0885, 2016 WL 3405453, at *15 (E.D. Pa. June 20, 2016)); *see also T.L.*, 2016 WL 3405453, at *14–15 (holding that the district offered the student a FAPE where the IEPs it offered over a two-year span included goals and specially designed instruction intended to address the student's behavioral issues).

(ii)    The October 2018 IEP Offered a FAPE

In October 2018, the District revised Isabelle's IEP to include additional goals and services to address Isabelle's ongoing behavioral issues.[39]  (Doc. No. 22-3 at 82.)  Plaintiffs argue that the October 2018 IEP did not offer Isabelle a FAPE because, "with the exception of the social skills goal, all the goals to address [Isabelle's] social-emotional needs had been in place, without modification, *since February*."  (Doc. No. 28 at 17 (emphasis in original).)  They contend that "[a] proper FAPE evaluation would have explained why continuing interventions

---

[39] The District also revised Isabelle's IEP earlier in the month to include physical therapy services after the District's physical therapist observed Isabelle and determined that she had decreased coordination.  (Doc. No. 22-3 at 38.)

33

that had not proved to be effective[] and would have suggested new goals and strategies which might have been effective." (*Id.* at 18.)

Plaintiffs' representation of the October 2018 IEP is misleading. Although some of the goals had been in place since February 2018, many of the goals and specially designed instructions were added in April 2018 after the District reevaluated and conducted a Functional Behavioral Assessment of Isabelle. (Doc. No. 22-3 at 119–21.) And IEP goals are generally intended to remain in place for a full school year; they are not meant to be updated every two months. *See, e.g.*, *Matthew B. v. Pleasant Valley Sch. Dist.*, No. 3:17-CV-2380, 2019 WL 5692538, at *6–7 (M.D. Pa. Nov. 1, 2019) (illustrating that IEPs are ordinarily updated only one time per school year); *T.M.*, 251 F. Supp. 3d at 806–08 (demonstrating that IEPs are typically updated once per school year). In fact, Isabelle's own IEPs describe her goals as "measurable *annual* goals," not "measurable bi-monthly goals." (*See, e.g.*, Doc. No. 22-3 at 121.)

Further, the October 2018 IEP made substantial changes to address Isabelle's ongoing behavioral issues. It implemented the IU's recommendations and provided that Isabelle would receive 240 minutes per month of direct instruction on "social thinking" from the itinerant autistic support teacher who was trained on how to work with students with autism. (*Id.* at 141.) It also provided that Isabelle's teachers would receive 60 minutes per month of autistic support training so they could learn how to tailor their instruction to best suit Isabelle's needs. (*Id.*)

The hearing officer found that the October 2018 IEP offered a FAPE because "the annual goals and [specially designed instruction] were substantively appropriate when offered." (Doc. No. 22 at 37.) He acknowledged that in the due process hearing, Plaintiffs complained that the revisions were insufficient but found that "they failed to produce preponderant proof describing a substantive or procedural fatal flaw or actionable defect." (*Id.* at 36.) For instance, Plaintiffs'

34

expert was critical of the strategies in the October 2018 IEP, but the hearing officer "gave his report and testimony less persuasive weight" for six reasons:

(1)     The expert did not observe Isabelle at public school in the District or at Montessori;

(2)     The expert did not interview any of the District's teachers or staff who had worked with Isabelle on a daily basis;

(3)     The expert did not have Isabelle's teachers from the District complete any checklists or rating scales to gauge her behavior;

(4)     The expert "did not appear to have a cogent understanding of the then-existing regular or special education in the District or [Montessori]";

(5)     The expert did not discuss Isabelle's behavioral needs with the District's psychologist, the behavioral specialist, the speech therapist, or the autistic support teacher; and

(6)     The expert did not comment on the fact that certain evaluations showed that Isabelle was learning, growing, and progressing.

(*Id.*)

In sum, the hearing officer found that Plaintiffs' expert "missed an important opportunity to collect, evaluate and obtain a clear appreciation of [Isabelle's] otherwise fluctuating functional present levels that were supporting the underlying circumstances." (*Id.*)  As there is no evidence in the record to warrant overturning the hearing officer's credibility determinations, this Court must defer to them.[40]  *See C.F. v. Radnor Twp. Sch. Dist.*, CIVIL ACTION NO. 17-4765, 2019 WL 1227710, at *6 (E.D. Pa. Mar. 14, 2019) ("The hearing officer . . . observed that [the plaintiff's expert's] opinion was . . . weakened by the fact that [she] had not observed [the plaintiff in any classroom setting." (cleaned up)); *L.G. v. Wissahickon Sch. Dist.*, Civil Action

---

[40] In fact, the Court's own review of the expert's testimony confirms the hearing officer's conclusion:  some of the expert's own conclusions are so self-serving and untethered from reality as to squander his credibility.  For instance, the expert described the unwanted, well-intended hug Isabelle received from her third-grade special education classmate as an act of "sexual violence."  (Doc. No. 22 at 306.)

Nos. 06–0333, 06–3816, 2011 WL 13572, at *5 (E.D. Pa. Jan. 4, 2011) (adopting hearing officer's credibility determinations where the hearing officer "noted deficiencies in [the experts'] knowledge of [the district's] proposed educational program, including failure to observe the regular education class in which [the student] would have been placed").

Other than the expert's conclusions that the October 2018 IEP was not formulated to allow Isabelle to succeed, which this Court, like the hearing officer, will give "less persuasive weight" (Doc. No. 22 at 36), Plaintiffs have not offered any evidence that October 2018 denied Isabelle a FAPE.  *See H.D. ex rel. A.S. v. Cent. Bucks Sch. Dist.*, 902 F. Supp. 2d 614, 625 (E.D. Pa. 2012) (holding that an IEP offered a FAPE where the only evidence suggesting that revisions to the student's IEP denied a FAPE was "testimony from [the student's] expert witnesses, which testimony the Hearing Officer . . . found less credible than the conflicting testimony of the District's witnesses").  Because the Court defers to the hearing officer's credibility determinations, the Court finds that Plaintiffs have not met their burden and affirm the hearing officer's ruling that the October 2018 IEP offered a FAPE.

### (iii)   The November 2018 IEP Offered a FAPE

The District met with Isabelle's parents again in November and crafted a six-step plan to address Isabelle's continued behavioral decline:  (1) Isabelle will be observed at various points throughout the school day by newer members of the IEP Team to gather additional information regarding the heightened behavioral issues; (2) behavior charts, communication logs, and information coming from the itinerant autistic support teacher will be sent to Isabelle's parents electronically; (3) the IEP Team will collect new academic baseline data to check that her goals reflect her current academic levels and to ensure that she is receiving the amount of direct instruction that she needs; (4) after Isabelle's parents receive the results from the private

evaluation to be conducted by Providence Behavioral Health, the IEP team will reconvene to review the evaluator's report and update her IEP to reflect interventions recommended in the report; (5) after the academic baseline data has been updated and the IEP has been revised to reflect the findings from the private evaluation, the IEP Team will add the necessary accommodations and interventions to ensure that Isabelle has the tools she needs to reach the goals; and (6) Isabelle's behavior chart will be updated to prevent any outbursts that might be caused by the layout of the current behavior chart. (Doc. No. 22-4 at 4–5.) The District added a specially designed instruction for the additional observations and planned to meet again in January to further tailor Isabelle's IEP with the benefit of the District's observations and data-collection as well as the parents' private evaluation. (*Id.*)

Plaintiffs argue that the "[November 2018 IEP] meeting accomplished nothing": "The only real result of this IEP meeting was a promise to have another meeting after it conducted additional observations. . . . [The District's] response lacked urgency or specificity." (Doc. No. 28 at 15.) But the reason the IEP Team met in November was because Isabelle's parents had arranged for her to be evaluated by Providence Behavioral Health *in January*, and they wanted to discuss the plan to implement the recommendations from the evaluation once it had been conducted. (Doc. No. 22-4 at 4.) Plaintiffs do not offer any evidence that the November 2018 IEP was substantively defective other than the fact that Isabelle's behavior did not improve. Nor could they. The IEP meeting was held on November 28, and Isabelle's parents withdrew her from the District on December 10, just eight school days later.

The record supports the hearing officer's conclusion that, "taking into account the Parents['] concerns about the fluid nature of [Isabelle's] circumstances, . . . the proposed November 2018 IEP and the actions taken, in real-time, to revise, redesign and then implement

the November [2018] IEP were individually and collectively reasonably calculated to provide a

FAPE." (Doc. No. 22 at 38.) The November 2018 IEP was a culmination of the District's

repeated attempts to address Isabelle's ongoing behavioral issues. Although Isabelle had

behavioral issues throughout her time at the District (which earlier iterations of the IEPs

attempted to address), her behavioral issues continued to escalate in November 2018, and the

District revised her IEP for the fourth time in as many months to address those issues. (Doc. No.

22-3 at 145.) It was reasonable for the District to let its own Behavior Interventionist and

Special Education Consultant and the parents' private evaluator observe Isabelle before it

substantially revised her goals again. And, even though the District chose to further evaluate

Isabelle before modifying her IEP again, the November 2018 IEP and the District's subsequent

actions reflect careful consideration in an attempt to avoid the situations that were causing

Isabelle's behavioral issues.[41]

The District's repeated efforts to offer Isabelle behavioral supports are similar to the

behavioral supports the district offered in *T.L. v. Lower Merion School District*, 2016 WL

3405453. In *T.L.*, the student was struggling behaviorally and academically. *Id.* at *15. The

district offered the student seven IEPs over a one-year period, all of which included goals and

---

[41] Plaintiffs suggest that they were most concerned about Isabelle's self-harm talk. The Court agrees that these behaviors are very troubling; however, Isabelle's parents have admitted that she often speaks in hyperbole, using phrases such as "I want to die" as a way to express frustration, not because she actually intends to act on those statements. (*See* Doc. No. 22 at 366 ("Isabelle will make exaggerated comments. She'll say things like, you know, something tiny goes wrong in the morning, she'll say I guess my day is ruined then or you must just want me to die.").)

At oral argument, Plaintiffs suggested that they took Isabelle's statements on December 10 that she "might as well die then" more seriously because she was also "talking about harming herself with a knife from the kitchen drawer." (*See* Doc. No. 22 at 348.) Again, the Court finds these behaviors extremely concerning and upsetting, but evidence in the record shows Isabelle's parents and the District recognized that such statements were not atypical for Isabelle. For instance, on September 24, 2018, she threatened to burn herself or "hurt [herself] with a knife." (*Id.* at 18.)

specially designed instruction intended to address the student's behavioral difficulties.  *Id.*  The

district also conducted a Functional Behavioral Assessment and provided the student with a

Positive Behavior Support Plan.  *Id.*  The court found that the district "appropriately considered

the statutory requirements concerning behavioral interventions" by recognizing that the student's

behavior impeded his learning and by offering "the use of positive behavioral interventions and

supports."  *Id.*  The court concluded that the District's repeated efforts to address the student's

behavioral issues offered the student a FAPE and explained that "the sufficiency of [the

district's] strategies for dealing with this behavior 'is precisely the type of issue upon which the

IDEA requires deference to the expertise of the administrative officers.'"  *Id.* (quoting *A.C. v.

Bd. of Educ. of Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 172 (2d Cir. 2009)); *cf. Colonial Sch.

Dist. v. N.S.*, CIVIL ACTION No. 19-1311, 2020 WL 1517562, at *14–15 (E.D. Pa. Mar. 30,

2020) (finding that the school district failed to provide a student who had exhibited behavioral

issues for over two years with a FAPE because the district did not conduct a Functional

Behavioral Assessment, implement a Positive Behavior Support Plan, or meaningfully modify

her IEP even though it recognized that the student's IEP was inadequate).

So too here.  The District updated Isabelle's IEP *five* times in *eight* school months.  (Doc.

No. 22-3 at 145.)  Every iteration of Isabelle's IEP included goals and specially designed

instruction targeted at improving her behavioral issues, and the District modified Isabelle's IEPs

in real time, as her behavior declined.  (*See id.*)  The District also conducted a Functional

Behavioral Assessment and provided Isabelle with a Positive Behavior Support Plan in April

2018 that it also updated, in real time, to address Isabelle's evolving behavioral issues.  The

District has certainly not "systematically and consistently" failed to respond to Isabelle's

behavioral issues.  Rather, these changes reflect significant, unwavering efforts on the part of the

District to offer Isabelle a FAPE, and the preponderance of the evidence supports the hearing officer's determination that the November 2018 IEP—and all of the other IEPs—"complied with the IDEA's FAPE mandate."  (Doc. No. 22 at 38.)

*      *      *

Because the District did not deprive Isabelle of a FAPE, the Court affirms the hearing officer's decision and denies Plaintiffs' requests for tuition reimbursement and compensatory education.

### B.      Section 504 and ADA Claims

The IDEA does not allow for the recovery of fees and costs, so Plaintiffs seek expert fees, attorneys' fees, and costs under Section 504 and the ADA.  (Doc. No. 1 at 30–31.)

As a threshold matter, the District argues that the "[Section] 504 and ADA claims must be dismissed as they were not exhausted at the administrative level."  (Doc. No. 29 at 21.)  When plaintiffs bring non-IDEA claims seeking relief that can be obtained under the IDEA, they must exhaust those claims through the IDEA administrative process.  20 U.S.C. § 1415(*l*); *see also Batchelor*, 759 F.3d at 272–73.  Non-IDEA claims must be exhausted through the IDEA administrative process when the "gravamen" of the plaintiff's complaint indicates that the plaintiff seeks relief for denial of a FAPE.  *Fry*, 137 S. Ct. at 755.

When looking to the gravamen of a complaint to determine whether it seeks relief for the denial of a FAPE, the Court must consider the individual claims within the complaint and the collection of claims in the complaint as a whole.  *Wellman v. Butler Area Sch. Dist.*, 877 F.3d 125, 132 (3d Cir. 2017).  The Supreme Court has instructed that one "clue" that the gravamen of a complaint arises out of denial of a FAPE "can come from asking a pair of hypothetical questions":  "First, could the plaintiff have brought essentially the same claim if the alleged

40

conduct had occurred at a public facility that was not a school?  Second, could an adult at the school have pressed essentially the same grievance?"  *Fry*, 137 S. Ct. at 747.  When the answer to both questions is no, then the complaint likely seeks relief for denial of a FAPE.  *Id.*  In addition to these hypothetical questions, the Supreme Court also instructed courts to consider the history of the proceedings.  *Id.*  That a plaintiff has previously pursued administrative remedies under the IDEA is a sign that the gravamen of the plaintiff's complaint concerns the denial of a FAPE.  *Id.*

Plaintiffs do not dispute that they failed to exhaust their administrative remedies with respect to the Section 504 and ADA claims (Doc. No. 30 at 27–28); rather, they argue that exhaustion "should not be necessary" (*id.* at 28).  Regardless of what Plaintiffs *think* should be necessary, their claims arise out of the denial of a FAPE, so exhaustion *is* necessary.  *See Fry*, 137 S. Ct. at 755.  Viewing the complaint as a whole, it is clear that Plaintiffs' claims center around the quality of education that Isabelle received.  Plaintiffs allege that "the District failed to offer Isabelle appropriate educational and related services" (Doc. No. 1 ¶ 148) and "fail[ed] to provide [a] FAPE to Isabelle" (*id.* ¶ 151).  This supports the finding that Plaintiffs seek relief only for the denial of a FAPE.[42, 43]  *See J.L. ex rel. Leduc v. Wyoming Valley W. Sch. Dist.*, 722 F. App'x 190, 193 (3d Cir. 2018) (holding that the plaintiff's claim arose solely out of denial of FAPE where complaint alleged that the failure to provide one-to-one aide to protect the student

---

[42] The *Fry* framework also supports the conclusion that the Section 504 and ADA claims "stem from the [District's] alleged failure to accommodate [Isabelle's] condition and fulfill [her] educational needs."  *Wellman*, 877 F.3d at 133; *see also Fry*, 137 S. Ct. at 756–57.  The conduct complained of could not have occurred outside of the school setting, and a nonstudent visitor could not have "pressed essentially the same grievance."  *Fry*, 137 S. Ct. at 756.

[43] In fact, Plaintiffs conceded at oral argument that the Section 504 and ADA claims "arise out of the same set of facts" as the IDEA claim.

violated her "educational rights," "educational programs," "educational services," the "educational environment," the "educational setting," and the plaintiff's "special educational needs"); *S.D. ex rel. A.D. v. Haddon Heights Bd. of Educ.*, 722 F. App'x 119, 126 (3d Cir. 2018) ("The substance of Appellants' grievance is that Appellee failed to provide instruction tailored to meet S.D.'s special needs resulting from his disability.  Their claims therefore concern the denial of a FAPE to S.D."); *Henry v. Sch. Dist. of Phila.*, CIVIL ACTION NO. 19-1115, 2019 WL 4247914, at *8 (E.D. Pa. Sept. 6, 2019) (holding that the plaintiffs' claim arose out of denial of FAPE where the plaintiffs alleged the school district "deprived [student] of access to the educational opportunities and benefits provided by the District").

Because Plaintiffs failed to exhaust the Section 504 and ADA claims, the Court must dismiss these claims for lack of subject matter jurisdiction.  *See S.D.*, 722 F. App'x at 129.

Even assuming *arguendo* that Plaintiffs were not required to exhaust their Section 504 and ADA claims, these claims nevertheless fail.  To prevail on Section 504 and ADA claims,[44] Plaintiffs must prove that: (1) the child was "disabled," (2) the child was "otherwise qualified" to participate in school activities, (3) the school district received federal funding; and (4) the child was "excluded from participation in or denied the benefits of the educational program receiving the funds, or was subject to discrimination under the program."  *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 275–76 (3d Cir. 2014).

The parties agree that the first three prongs are satisfied.  (Doc. No. 29 at 22–23.)  The only question is whether Isabelle was denied the benefits of the educational program.  Plaintiffs argue that Isabelle was denied the benefits of the educational program and the District violated

---

[44] "[T]he substantive standards for determining liability under the Rehabilitation Act and the ADA are the same . . . ."  *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 282–83 (3d Cir. 2012).

Section 504 and the ADA by failing "to provide [a] FAPE to Isabelle." (Doc. No. 1 ¶ 151.) But as discussed above, the hearing officer found, and the Court agrees, that the District *did* offer Isabelle a FAPE throughout the relevant period. *See supra* Section II.A.2. As such, Plaintiffs are not entitled to relief under Section 504 or the ADA. *See Richard S. v. Wissahickon Sch. Dist.*, 334 F. App'x 508, 509 n.1 (3d Cir. 2009) ("Appellants' § 504 and IDEA claims are factually indistinguishable, and the resolution of the IDEA claim is therefore also dispositive of the § 504 claim."); *Gwendolynne S. ex rel. Judy S. v. W. Chester Area Sch. Dist.*, No. 19-cv-3844-JMY, 2021 WL 949483, at *14 (E.D. Pa. Mar. 12, 2021) ("Plaintiffs failed to establish that Gwendolynne was denied a free, appropriate education, [so] the Section 504 and ADA claims fail."); *E.D. ex rel. T.D. v. Colonial Sch. Dist.*, CIVIL ACTION NO. 09-4837, 2017 WL 1207919, at *15 (E.D. Pa. Mar. 31, 2017) ("We determined that, consistent with the hearing officer's conclusion, Plaintiffs have failed to show that E.D. was denied a FAPE during the 2006-07, and 2007-08 school years. As a result, Plaintiffs are not entitled to compensatory damages.").

*     *     *

Plaintiffs failed to exhaust their administrative remedies as to their Section 504 and ADA claims, so the Court lacks subject matter jurisdiction over these claims, and they are dismissed. But even if we had subject matter jurisdiction over these claims, they would nevertheless fail because the District provided Isabelle with a FAPE.

### III.

Because the District offered Isabelle a FAPE, the Court denies Plaintiffs' Motion for Judgment on the Administrative Record. (Doc. No. 33.) An appropriate Order follows.